No. 16,282.

ZIMMERMAN *v.* FRANZEN, ADMINISTRATRIX.
(220 P. [2d] 344)

Decided May 8, 1950.   Rehearing denied June 26, 1950.

Messrs. JANUARY & YEGGE, MARGARET R. BATES, Mr. J. NELSON TRUITT, for plaintiff in error.

Mr. BENJAMIN E. SWEET, Mr. H. LAWRENCE HINKLEY, for defendant in error.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

HENRY M. FRANZEN brought an action against Madaline Zimmerman to recover judgment for damages for personal injuries allegedly sustained by him as a result of being struck by an automobile driven by her. Trial was had to a jury, resulting in a verdict and judgment in favor of plaintiff for $10,000, 'to reverse which defendant has sued out a writ of error.

In the complaint it is alleged that on December 5, 1947, on a public highway in the City and County of Denver, "defendant negligently and carelessly drove a motor vehicle against the plaintiff who was then and there unloading a delivery truck on said public highway." It is further alleged that as a result plaintiff's arms, back and legs were injured; that he has been unable to work; and that he incurred medical expenses, all to his damages in the sum of $25,000; further that plaintiff is informed and believes that the injuries sustained will be permanent.

Defendant in her answer denied generally the allega-

tions of the complaint; for a first affirmative defense she alleged that the damages and injuries, if any, were sustained or proximately caused by plaintiff's own negligence; for a second affirmative defense it is alleged that plaintiff's injuries and damages, if any, were caused by his contributory negligence; for a third affirmative defense it is stated that plaintiff's injuries and damages, if any, were proximately caused by an unavoidable accident; and for a fourth affirmative defense, defendant charges that plaintiff's injuries and damages, if any, were proximately caused by his assumption of risk.

Plaintiff replying to the second affirmative defense, pleaded the doctrine of last clear chance.

Plaintiff testified on direct examination that on December 5, 1947, and for about two and a half years prior thereto, he was employed by the Package Delivery Service Company as a helper on one of its trucks, the principal use of which was the delivery of rugs and other heavy merchandise. On the date last mentioned plaintiff was engaged in removing a rug weighing 260 pounds from the rear of the delivery truck, double parked, when defendant drove her automobile from the curb immediately to the rear of the truck and struck defendant in the back, with such force that the rug was pushed into the truck again. On cross-examination plaintiff testified as follows:

"Q. May I ask you how wide that truck was? Just estimate. * * * A. I really don't know how wide they are. I imagine about seven or eight feet, I don't know. I never measured it. * * * Q. Mr. Franzen, with relation to the rear end of the Package Delivery truck, just where were you standing when this accident occurred? A. In the rear of the truck. Q. How far from the truck? A. Oh, probably a foot and a half, something like that. Q. As I understand it, you had a large Karastan 9 x 12 rug on your left shoulder when you were hit. A. Yes. * * * Q. Were you twisted around? A. No, I wasn't. Just, you know, you have a different

position than when you try to lift a rug up. * * * Q. Now, you had this rug on your back. How much was sticking over the rear of your shoulder at the time of the accident? A. I couldn't tell you because I was trying to balance it. * * * Q. Did your rug strike that automobile before it struck you? A. What do you mean? Q. Did your rug strike the side of that automobile before the door of the car struck you? A. No. I don't think the car hit the—the rug hit the car at all. Just the minute I got hit with force I just shoved that rug back into the truck. That was nature. No more. Q. Well, the rug was on your shoulder, though, wasn't it? A. I was trying to get it there. Q. Could you have any explanation to the jury as to why if the rug was sticking out further behind you, why the rug would not hit the door before the door hit your arm? A. No, I can't. Everything went so quick that I didn't know nothing. Q. Isn't it entirely possible and reasonable, Mr. Franzen, that after you got this rug on your shoulder that you started backing up with the package into the door of that car? A. I wasn't backed up yet. I didn't have the rug out of the truck yet. I had it in back of the truck trying to get it on my shoulder. Q. And you contend you were only a half a foot back of the center of the rear of the truck when you were hit? A. I think it was something like that. * * * Q. You were in about the center of the truck unloading it [rug]? A. Yes."

Plaintiff further testified that at the time of the accident he declined hospitalization as being unnecessary and that the pain most noticeable was in his elbow, which he thought had been broken. Later in the evening he noticed pain in the lower part of his back and was sent to a doctor who prescribed the application of heat.

At the time of the trial, occurring on the 24th day of January, 1949, plaintiff testified that it was difficult for him to work, and he became overbalanced and fell. He

578

further testified that in June, 1948, his employer "laid him off" because he couldn't do his work properly, and that he had not recovered subsequently so as to engage in any employment. He also testified that prior to the accident he had enjoyed excellent health and was able to perform heavy work without inconvenience and had been engaged in such work by an ammunition manufacturer and others where it was necessary for him to do heavy lifting.

Plaintiff's attention was called to his deposition taken on October 11, 1948, in which he testified he was struck on the back of his left arm. He further testified that he was not knocked down and was not twisted by the blow, and, while he could not continue doing heavy work, he remained with his employer until June 14, 1948, except for a short time when he was "loaned" to another company engaged in the same general class of work. He worked steadily and lost no time by reason of the accident. He was interrogated about an accident in which he was involved on February 28, 1948, when he dropped a washing machine and received injuries, but replied that he remembered nothing about this incident. He further testified that he had no recollection of seeing a physician at about February 28, 1948, for treatment of injuries received in this accident. He stated that it was the door of defendant's car which struck him while he was standing directly in the rear and about a foot and a half from the back of the delivery truck and engaged in putting the rug on his shoulder for the purpose of carrying it into a building and laying it, and that the blow was "just behind the elbow." ·

Plaintiff's witness, Arthur Oldenettel, testified that on December 5, 1947, and for some time prior thereto, he and plaintiff, who was his helper, were engaged in delivering rugs and other heavy articles. At the time of the accident the truck had been driven northerly and was double parked on the easterly side of a public street. Witness had pulled out from other articles a rug

crated "in a small box" for delivery near where the truck was then double parked. When he saw plaintiff just prior to the accident, and immediately subsequent thereto, he was standing on the west side of the truck toward the center of the street and about two feet from the truck, and while witness was engaged with other matters in connection with his work, he heard a noise, immediately turned toward plaintiff, and was informed by the latter that he had been hit. He testified that he took plaintiff to a physician daily for about three weeks after the accident, and on one occasion, shortly after the accident, plaintiff exhibited to him "a kind of a red mark on his back, I would say about a foot long." Witness stated that he did not believe that defendant's automobile struck the truck. This witness's attention was called to statements made by him at the time his deposition was taken, and he then stated that he did not see the door of defendant's automobile hit plaintiff; nevertheless he did see plaintiff "lying in the street" immediately after the accident, but this latter statement witness corrected on his examination at the trial. This witness and plaintiff continued working for about a month after the accident of December 5, 1947, when witness was laid off because the rug truck upon which he and plaintiff were working was discontinued. During this month period subsequent to the accident this witness testified that plaintiff "couldn't do his work. He couldn't lift anything. He complained about his arm all the time. He couldn't do nothing with his left arm. * * * This arm was useless. He could lift something with his right arm, but this left arm was useless as soon as he tried to use it, but there wasn't very much—he wasn't very much of a help." During the time that witness and plaintiff continued operating the delivery truck, the record discloses no evidence whatever that plaintiff's incapacity to perform his work, to which this witness testified, was occasioned by any injury to his back.

Plaintiff called Drs. Clyde James Cooper and Charles G. Freed to testify in his behalf.

Dr. Cooper made a complete physical examination of plaintiff on either July 12, 1948, or July 29, 1948. He testified than on February 28, 1948, plaintiff was sent to him by his employer for treatment for an injury which he had received when he fell off a "step carrying a washing machine and the washing machine had fallen on his left leg and foot." At that time the witness made no complete physical examination of plaintiff, who required treatment for his injury on three or four subsequent occasions. Thereafter, and in July, plaintiff was given a careful physical examination, and at that time he gave a complete history of his injury occurring on December 5, 1947, and with reference thereto, said: "That on December 4 or 5, while double parked, a car pulled away from the curb and the open door *hit his elbow and twisted his back*. He said he wasn't thrown to the ground; that he wasn't taken to the hospital, and he was sent to the company doctor about three days later and had X rays taken of his arm and was told it was not broken. It says on my report here at this time his back was bothering him." The doctor then was asked, "Is it possible, Doctor, that this trouble, this pain he was suffering under, could be attributed to the leg injury back in February, 1948? A. Why, no complaint was ever made during the time he came to see me in the original accident to his back, no discussion was ever made. Q. What was the trouble with his back, in your opinion? A. Well, from the X-ray pictures it showed he had a congenital condition, a congenital defect in his back. Q. What is that? A. Spondylolisthesis."

The doctor was also asked: "Q. Mr. Franzen told you what happened when this open door *struck his back*. Is it possible for a blow of that type to cause injury to the lower part of the back? A. Well I think from the statement that it *twisted him* when the door hit his shoulder, it threw him and *twisted his back*. * * * Q.

What is your opinion as to whether or not this *blow* that he received, assuming he did receive it, aggravated the symptoms in his back. Would you say that it probably did or didn't? A. I would think so, *from his story.* * * * Q. State whether or not it is possible that it [plaintiff's physical condition] could continue the rest of his life? A. It is *possible.* * * * Q. You testified that considering the *history that he gave you, from his story,* I believe you put it, that there is a *possibility* of aggravation; and I believe he told you that he twisted his back. Is that correct? A. I believe that is—(refers to memo)—that's right." (Italics ours)

The doctor further testified that when he first saw plaintiff and treated him with reference to the fall off the steps and for the injuries resulting therefrom that no complaint was made about any back injury.

On redirect examination: "Q. One further question, Doctor: Assuming that Mr. Franzen prior to *November 5, 1947,* when this accident happened, had never had any backache and that backache developed immediately after that, did that have any significance in analyzing this case and attempting to determine what the cause of his disability or injuries was? A. If he had no previous trouble? Q. Yes. A. Well, it would be—the way I look at it, from the *history* here, he has no history of previous trouble, and yet he had this injury in which *he twisted his back,* and from then on these symptoms have been produced and have increased in severity. Q. You mean the injury of December 5th? A. The injury of December 5th, yes. Q. When he was struck by the car door? A. Yes." (Italics ours)

On cross-examination this question: "Q. One question, Doctor: You are basing that opinion upon what he told you? A. That's right."

This doctor also testified that plaintiff's disability was probably thirty to thirty-five per cent and that when he treated him on February 28, 1948, for the injury to his

leg, after the washing machine fell on it, no complaint was made about any injury to his back.

Dr. Freed, an expert witness, called by plaintiff, testified that he began a complete physical examination of the plaintiff in July, 1948, and made a report thereof on July 19, 1948.

This witness stated that Mr. Franzen told him "that on December 5, 1947, he was *loading* a heavy rug into a truck which was double parked. Another car pulled out from the curbing with the back door open and the door *struck his left arm while he was supporting the weight of the rug with the left shoulder.* He stated that he *twisted his back* but was not knocked down. At the time he noticed that he had a severe pain in the left arm and the day following this injury he began having a little back pain." The doctor gave detailed testimony as to the physical condition of the patient as revealed by his examination, and then stated, "On the basis of these findings and the *claimant's history*, it was my opinion these symptoms [pain in the lower back and pain in both legs and dragging his feet] were probably due to spondylolisthesis or instability of the lumbosacral joint demonstrated by X-ray. It is my further opinion that this condition was *probably aggravated* by the injury he describes as having occurred December 5, 1947." After testifying that plaintiff's estimated disability as a working unit was about twenty-five per cent, he stated that surgery would probably reduce the same to about five per cent and orthopedic consultation was recommended. With reference to the duration of this disability, the witness, in answer to the question, "Are you able to state how long this condition [disability] may continue?" answered, "Well, without surgical intervention it may be *permanent,* and it *may clear up,* and have recurrent attacks of back pain from time to time."

While this witness would not recommend surgery for the correction of the congenital condition, found to be present in plaintiff, nevertheless he said surgery would

not result in any disability, but a stiffness might be apparent from an *arthritic condition found on examination in plaintiff's back.* On cross-examination the doctor testified that the congenital spondylolisthesis apparent in plaintiff could be aggravated either by a twist or by a fall, or by bending over in an awkward position, or by lifting heavy articles. He was asked, "Q. Did he [plaintiff] give you any history of an accident on February 28, 1948? When he fell with a washing machine and the washing machine fell on his leg and broke the washing machine? A. No, he did not. Q. Assuming at that time, Doctor, that his back was twisted, could that have aggravated the symptoms? A. Yes, sir."

This witness's opinion as to plaintiff's condition, taken from his history and a physical examination, has been heretofore set forth. On cross-examination he was further interrogated as follows: "Q. Doctor, is it true that any other kind of a twist or a fall could also aggravate those symptoms? Is that not right? A. Yes sir. Q. In other words you are basing your *opinion* upon the history that Mr. Franzen gave to you? That is all you had to go on? A. Yes sir."

Defendant was called for cross-examination under the statute, and her testimony thus given, as well as that upon direct and further cross-examination, may be thus summarized: She testified that on December 5, 1947, she conducted a nursery school, and on that day was engaged in delivering some of her pupils to their homes. She stopped immediately behind a truck, which had been driven in a northerly direction and double parked on the easterly side of a public street, in order to return two of the children to their homes, after which she closed the rear door of her automobile, leaving a four year old child in the back seat. The rear door on the automobile which defendant was driving could be locked only from the inside, and this defendant did not do. She saw plaintiff standing in the rear of the double parked truck, and, desiring to leave the curb, started to pull around the

truck after first ascertaining whether she could safely do so and having given all proper hand signals and using her "mirror." At or about the time of the accident, the little girl shouted "Shut the door, Shut the door." Defendant felt no impact and believed at that time that the door had been blown open by a gust of wind and was unaware of the fact that plaintiff had been injured until after the shout, and she stopped almost immediately. The rear right-hand door of the automobile was forced back against the fender and the glass in it was broken, but it was not so seriously damaged as to prevent the door being closed, thus enabling defendant to proceed. When defendant had stopped, plaintiff came to the automobile, and, upon being asked, stated that he had been hit on the elbow.

Defendant testified, and this testimony is undisputed, that the automobile, and particularly the rear right-hand door, was in mechanically good condition before the accident and after the accident was in such condition that it could be closed. Defendant did not sound her horn or give any warning to plaintiff that she was about to proceed from the curb around the double parked truck behind which the plaintiff was standing at the time defendant started to leave the curb.

On cross-examination defendant was asked: "Q. You did look back again [after starting to leave from the curbing] to see whether or not Mr. Franzen had changed his position or had moved out of the front of the car? A. No. Q. Did it occur to you that Mr. Franzen might have stepped out of the path of your car as you were pulling out? A. As I said, I was going too slowly. I didn't think that he would, no. * * * Q. Do you know what caused the door to be open? A. I couldn't say for sure, no, but I have an idea that the youngster tried to lock the door and instead of pulling up on the handle she probably pulled it open."

At the conclusion of this testimony plaintiff rested,

and defendant interposed a motion for a directed verdict, which was denied.

Whereupon defendant introduced evidence which may be thus summarized: The vice-president of the Package Delivery Service Company, by which plaintiff had been employed for some time prior to December 5, 1947, and until January 19, 1948, testified: Plaintiff was employed as a helper on a truck largely used in delivering rugs. Shortly after December 5, 1947, plaintiff's employer was advised of an injury to him on that date; sent him to a physician, and reported the accident to the Industrial Commission. Plaintiff lost no time from work because of the injury. On the pay week end on January 19, 1948, plaintiff left this employment because of lack of work and was re-employed during the work week of March 14, 1948, at which time he was engaged as a helper on a truck hauling refrigerators and other heavy appliances and continued in this employment until June 14, 1948, when his services were discontinued, but not because of any physical disability or inability to do the work.

The president of the United States Transfer and Storage Company testified that his company was engaged in the distribution of carload lots, and employed plaintiff on January 28, 1948, as a helper on a truck engaged largely in the delivery of refrigerators, mirrors, washing machines, and other like merchandise, and that he continued in this work until about March 13; that on February 28, 1948, plaintiff, while assisting in delivering a washing machine, was injured, and a report thereof was made to the insurance carrier. The accident occurred on the afternoon of Friday, and plaintiff did not return to work until the following Monday. When this witness was asked, "Why did he [plaintiff] leave your employment, Mr. Laughlin?" he answered, "Well, the May Company notified us that they would not want these trucks any longer; they had made another deal. The man was not discharged; he was laid off with others

—there were two helpers, both of whom were laid off because we had no use for them."

The purchaser of the washing machine involved in the accident of February 28, 1948, testified that the accident was first called to her attention by someone advising her that a man had slipped and hurt his foot; that when she first saw plaintiff he was sitting on one side of the step at the rear of her house, the washing machine was on the other side of the step and was damaged to such an extent that she refused to accept delivery thereof. When plaintiff left the scene of this accident, he was assisted to a car by his fellow employees, and it was concerning this accident that Dr. Cooper testified concerning his first treatment of plaintiff.

Defendant's testimony has been heretofore sufficiently summarized.

Defendant called Dr. S. P. Newman to testify as to an examination which he made of plaintiff on September 10, 1948. In answer to a question requesting the history given him by Mr. Franzen, he stated: "A. A history was obtained from this patient, after which he was examined and in addition to that I examined the X rays made of this man's spine. On his history he told me that he sustained an injury on December 5, 1947, while standing beside his delivery truck, when an automobile *caught him on the side,* and he told me *he was rolled sideways in this accident and sustained an injury to his left arm and left elbow."* (Italics ours) At the moment he thought this was the only injury he had sustained, besides minor bruises and abrasions. He stated, however, that the following morning he had difficulty in arising from bed because of pain over his lower back and sacro region. He advised me of heat treatments given him by physicians and taken by him at home, and stated that he had never had any back trouble prior to the present complaint. This witness testified that the patient had a moderate *hyperthrophic arthritic* change in the lumbar spine, and also stated that in his

opinion plaintiff's symptoms in his lower back could be reasonably accounted for on the basis of spondylolisthesis. It was the opinion of the witness that the condition in which he found plaintiff on September 10, 1948, could not have been brought about by a blow to his arm or elbow. In response to the question, "In your opinion, Doctor, assuming that this condition, this spondylolisthesis, was a congenital condition, do you believe that the injury which he sustained might have aggravated that condition?" the witness answered: "I do not believe that it is likely. It is possible, but I do not think it is likely."

This witness further testified that plaintiff's disability as a working unit and attributable to spondylolisthesis, was twenty to twenty-five per cent, and that as at present advised he would not recommend surgery. In response to this question: "Should the history be given to you, Doctor, or developed from the testimony, that this plaintiff suffered an injury due to a fall late in February of 1948, and that at the time of the fall in February of 1948 the plaintiff was lifting heavy articles, such as washing machines and the like, and then later he complained of the disability that you observed when you examined him, would it not be just as likely, Doctor, that this aggravation could have occurred in his accident late in February as well as the one in December, 1947?" the witness answered: "I think it could be just as likely."

The witness then expressed an opinion that plaintiff's present condition was the result of spondylolisthesis, and not due to any injury sustained on December 5, 1947, but that it was possible that the accident of that date might have aggravated the congenital condition. He also testified that plaintiff's present condition might be the result of a hard blow, heavy lifting, or a strain or fall.

In rebuttal plaintiff was re-called and disclaimed any

recollection whatever of the accident of February 28, 1948.

At the conclusion of all of the evidence the motion for a directed verdict was renewed and denied.

Plaintiff having passed away after the docketing of the cause here, by order of court the administratrix of his estate was substituted as defendant in error.

We call attention to the fact that the three medical experts, two for plaintiff and one for defendant, agree that the aggravated spondylolisthesis may have resulted from a blow to the back, a twist, heavy lifting, a fall, or bending in an awkward position. Here, the evidence discloses that on February 28, 1948, plaintiff slipped and fell while lifting a heavy appliance; that from December 5, 1947, until June 14, 1948, he was engaged in work which required the handling of heavy articles and materials and that his "lay-off" on June 14, 1948, was not occasioned by any inability on his part to handle his work in a satisfactory manner. It also is to be noted that although the medical experts were permitted to testify in detail as to the history given to them by plaintiff of the accident occurring on December 5, 1947, without objection, nevertheless the plaintiff failed to call attention to the accident of February 28, 1948, and one of plaintiff's medical experts definitely stated that the accident of that date could have occasioned the aggravation.

There are twelve specifications of points, and we shall only consider one thereof pertaining to an instruction which was given to the jury over defendant's objection as follows: "If you find from a preponderance of the evidence that the door of the defendant's car was open and struck the plaintiff while open causing injury and damage to him, such open door is prima facie evidence of the defendant's negligence, and the plaintiff is not required to prove what caused the door to be open."

There is direct and undisputed evidence that the right rear door of defendant's automobile was open and struck

the plaintiff. There is direct or legally inferable evidence from which the jury might have found that the rear right door on defendant's automobile came open as a result, either of defendant's failure to tightly close it, or that it was opened by the child in the back seat of the automobile, or was opened by being struck by a rug which plaintiff had removed or was attempting to remove from a delivery truck, or by a gust of wind. It might also be assumed that there was a fifth contingency, for the court, over the objection of defendant, and so far as our examination of the record reveals, with no evidence to support it, gave an instruction to the jury on the duty of the driver of an automobile to maintain it in such mechanical condition that it would not be injurious to the life of pedestrians or occupants of other vehicles.

Under the evidence adduced here, for aught appearing in the record, what caused the door to be open is as inexplicable to the defendant as it was to the plaintiff; that for some of the causes defendant would be liable; for others not.

■ Under these circumstances we are led to inquire whether error was committed by the court in instructing the jury on the principle, doctrine or rule, as it is variously designated, of res ipsa loquitur. Generally it may be said that the doctrine or principle or rule of res ipsa loquitur is applicable when the instrumentality which causes injury without any fault whatever on the part of the injured person is shown to be under the exclusive management and control of the defendant, and further that the resulting injury is such as, in the ordinary course of events, would not occur if the person having such exclusive management and control had used proper care. With this factual situation present, there arises a presumption or inference that the injury was the result of defendant's negligence. It has been said: "The reason or theory of the doctrine of res ipsa loquitur is based in part upon the consideration that, as

the management and control of the agency which produced the injury is, under the circumstances to which the doctrine applies, exclusively vested in defendant, plaintiff is not in a position to show the particular circumstances which caused the offending instrumentality to operate to his injury, while defendant, being more favorably situated, possesses the superior knowledge or means of information as to the cause of the accident, and should, therefore, be required to produce the evidence in explanation. Accordingly if the circumstances do not suggest or indicate superior knowledge or opportunity for explanation on the part of the party charged or if plaintiff himself has equal or superior means of information, the doctrine cannot be invoked." 45 C.J., p. 1205, §773.

Before the doctrine of res ipsa loquitur is applicable in this action, it must first be shown that the instrumentality causing the injury was under the exclusive management and control of the defendant. Further it must appear that there was no other proximate or contributing cause and if the injury may have resulted from more than one cause or by the intervention of persons other than the defendant acting independently, then, while defendant may ultimately be held liable, the judgment must be supported by evidence of defendant's negligence, independently of any presumption or inference arising from the application of the doctrine.

It would unduly lengthen this opinion, already too extended, to quote from our decisions, but the following, among others, support our conclusion: *Velotta v. Yampa Valley Coal Co.*, 63 Colo. 489, 167 Pac. 971; *Clune v. Mercereau*, 89 Colo. 227, 1 P. (2d) 101; *Yellow Cab Co. v. Hodgson*, 91 Colo. 365, 14 P. (2d) 1081; *Denver Tramway Corporation v. Kuttner*, 95 Colo. 312, 35 P. (2d) 852; *Berkens v. Denver Coca-Cola Bottling Co.*, 109 Colo. 140, 122 P. (2d) 884; *Boulder Valley Coal Co. v. Jernberg*, 118 Colo. 486, 197 P. (2d) 155; *Saliman v. Silk*, 118 Colo. 220, 194 P. (2d) 304. "The res ipsa

loquitur rule does not apply where it appears that the accident was due to a cause beyond the control of the defendant, such as the presence of vis major or the tortious act of a stranger. Nor does it apply where an unexplained accident may be attributable to one of several causes, for some of which the defendant is not responsible. It should not be allowed to apply where, on proof of the occurrence, without more, the matter still rests on conjecture alone or the accident is just as reasonably attributable to other causes as to negligence. In other words, if the facts and circumstances of the occurrence give rise to conflicting inferences, one leading to the conclusion of due care and the other to the conclusion of negligence, the doctrine does not apply. The res ipsa loquitur rule cannot apply in a case where the circumstances surrounding the accident are not such as to raise a presumption of negligence. It may happen that a plaintiff makes a prima facie case by showing the accident with its attendant circumstances, and yet destroys by his own evidence the application of the doctrine." 38 Am. Jur., p. 1000, §303. See, also: 1 Shearman and Redfield on Negligence (Revised Edition), p. 149, §56, et seq.; 45 C.J., p. 1206, §774, p. 1212, §780, p. 1214, §781; 9 Wigmore on Evidence (3d ed.), p. 380, §2509.

Although other specifications of points are presented, we do not consider it necessary to determine them, but by our failure to do so, it must not be understood that we approve them.

█ Under the evidence herein, we hold that the court erred in instructing the jury on the doctrine of res ipsa loquitur, and, accordingly, the judgment is reversed.

Mr. Chief Justice Hilliard dissents.